On behalf of the FDIC, I want Mr. Richard Hellerman. On behalf of the FDIC, Mr. Patrick Lewis. Gentlemen, are you both ready to proceed? We are. You may proceed with your argument. While we are certain that the panel is well aware of the summary judgment standards, both in terms of granting and in reviewing, I think they bear repeating to begin our argument today. It is a drastic remedy that should be exercised dangerously with caution. The purpose of summary judgment is not to try or to determine a question of fact, but to decide if a question of fact exists, and if it does, summary judgment must be denied. The movement is only entitled to summary judgment if their right to judgment is clear and free from doubt. All inferences must be resolved against the movement, and it is inappropriate and improper and reversible error for a trial judge to make credibility determinations or we submit that Judge Ellsner below did pretty much all of the things that a trial judge is not supposed to do in passing on a summary judgment motion. His conduct in this case is particularly problematic and, we submit, reversible when you look at the facts in the Let me ask one question before you go on. Although you argue that there are questions of fact outstanding in this matter that need to be resolved, you also filed a motion for summary judgment. It is not on appeal, but if you thought there were issues of fact, why wouldn't you file a motion for summary judgment? It's not a response of pleading. Understood. As we are arguing this appeal, we believe, and I think it's in our brief in multiple places, that, in fact, there are so many questions of fact pertaining to whether this plaintiff could have ever obtained a summary judgment. We believe the very reason that there are, as we call them, questions of fact, but we say in our brief multiple times, there really are questions of fact. For example, with respect to the identity of the plaintiff at all, looking at, judging it, and responding to a plaintiff's motion, we say, well, there's a question of fact, but then we go on to say, really, when you look at the evidence, there really is no question of fact, but it's in the other direction. It's in defendant's favor. So, if anything, summary judgment should have been awarded in defendant's favor, because the plaintiff had no entitlement, and that's why we filed. So, whether we look at it offensively to suggest that there are no questions, that the plaintiff, for example, has no standing, that would entitle the defendant to summary judgment, but if we're here on this appeal defending against the entry of summary judgment to suggest that it was certainly improper and improvidently granted by Judge Elsner, then it doesn't make sense for us to say out front, there's no question of fact, it's just our no question of fact, not their no question of fact. We're calling it the same thing. There's a question of fact that certainly precluded the entry of summary judgment for the plaintiff. So, I understand the point. Segueing into the first point, you've alleged that the plaintiff, one of your objections is the plaintiff in the first instance lacked standing. Yes. They're asserting it was waived because you did not be pleaded when given leave to do so. So, what's your response to that? I think we've disposed of that fairly clearly and fairly quickly in our reply memorandum. The law is clear that the lack of affirmative defense, if you will, of standing, of lack of standing, does not amount to a waiver of that argument at the summary judgment phase. It amounts to a waiver at trial, if it is not otherwise made in the pleading. But the case we cited, Salazar v. State Farm Mutual Automobile Insurance Company, 191 Illinois County, Appellate 3871 out of the 1st District, we cite a block site on page 3 of our reply that addresses and disposes of that issue head on. And it says, undeniably, clearly, it does not place a restriction on motions for summary judgment if an affirmative defense alleging something like lack of standing is not asserted along with or in connection with the answer. An affirmative defense raised in such a motion is timely and may be considered even if not raised in defendant's answer. So, we think the waiver issue, while a nice attempt to try to head off the standing problem, is a red herring. And if you look at the remainder of the position that the plaintiff takes on these briefs, I can see why they tried to make a waiver argument, because on merits, respectfully, we don't think they have a leg to stand on. There are multiple problems with the standing issue with respect to this plaintiff. Initially, the case was filed in the name of an entirely different company. Only during depositions, when some testimony was had about whether this company existed or whether it didn't exist any longer, did Mr. Williams, who you'll be hearing from shortly, state, oh, I guess we'll be amending. They amended, but the amendment didn't even support with the testimony that was given by Joe McMahon. Joe McMahon's testimony and the very identity of the plaintiff is so problematic in this case. And the plaintiff, as we stand here today, Mueller-Pinehurst-Derry Incorporated's right to maintain this action. This goes further to your point, Justice Hutchinson. In defending against and suggesting that the summary judgment of the plaintiff should be reversed, we argue multiple times in our briefs that, in fact, given the state of the record, the only thing that could have been done properly under the law is to enter summary judgment in defendant's favor on the standing issue alone, not to mention the other many other issues in the case. How do we know that H.M. Incorporated, I guess, with all of the different entities, I might confuse them, so I apologize, retained, only sold the name and the right to do business. How do we know they retained other parts of the business, like the accounts receivable? Well, we don't know whether H.M. retained them, but what we do know is that if you look at the face of the documents in the transaction by which H.M. Inc., it was not merged, it was an asset sale. Those documents are part of the record. We've cited to them in the briefs, and we've actually block-cited from the actual agreement itself. Nowhere in the agreement, it's on page 6 going over to page 7 in our reply brief, and it could not be more clear that what is included does not include the term accounts receivable. But doesn't a business, a business is valued on a lot of things, but one of them is the balance of their accounts receivable versus the balances of their accounts payable. So why does it have to be specifically identified? Why can't we just assume that that was part of the transaction, and therefore the accounts receivable went with the business? Because the transaction was committed to writing. The terms of the writing set forth the terms of the purchase. It's standard contract interpretation, standard contract law. It would be improper for any court, either at the trial level or certainly at this level, to read into the This is not a back-of-the-napkin transaction. This was a typewritten, legal representation on all sides, presumably multimillion-dollar transaction, and it was specifically set up by the parties involved as an asset purchase. Does this fully integrated document say that the accounts receivable remain with the seller? No, it does not say that. There's no question. What it does say, though, is that the assets that are being purchased are described specifically in the second page of the actual agreement. It's page 460 of our appellate record. The vehicles, equipment, and business records, intellectual property, including trademarks and customer list, sales records for the preceding two years described in Exhibit A, here and after defined as assets. So it makes a reference to a second document, Exhibit A. Exhibit A identifies the fixed assets and nothing more. And those fixed assets included office equipment, hardware and software, miscellaneous coolers, milk dispensers, milk cabinets, and there was a list of the cabinets of milk, and then four vehicles. That's it. So you're saying that because it delineates certain specific assets and yet here, for whatever reason, it did not specify accounts receivable or contracts, that creates a material issue of fact? In other words, looking at it that way? Again, back to Justice Hutchinson's point. To answer your question, Justice Hudson, yes, at least a question of fact that would preclude summary judgment for the plaintiff. Further, I would submit that, frankly, considering your review of the summary judgment and the denial of the defendant's motion and the granting of the plaintiff's motion is de novo, we would submit that that point alone, the absence of accounts receivable as a delineated asset in this sale purchase that would then track to Muller Pinehurst Dairy through the next transaction, requires summary judgment in defendant's favor because Muller Pinehurst owns nothing of these accounts receivable. But certainly, at the very least, on this argument today as I stand here, it is, if not a resolved question in defendant's favor, a question of fact that must be construed against the plaintiff to preclude the entry of summary judgment and thereby have this Court reverse it. But apart from whether the transaction by which HM Inc. either did or didn't become HMLLC, there's a big question there alone, again, about how did the transactions that lead us to Muller Pinehurst as the named plaintiff, and not just Muller Pinehurst, as plaintiff chose to plead its amended complaint, it pleaded it as Muller Pinehurst Dairy Inc. as successor, as legal successor to Hawthorne Melody Inc. No one forced the plaintiff to state those words either in its caption or in the allegations of its amended complaint. Pleading it as such, plaintiff undertook an affirmative burden to prove what it pleaded. And we submit it failed to do that. Because there can be no conceivable interpretation of corporate law or the case law that interprets the corporate statutes that would consider or allow Muller Pinehurst Dairy to be the legal successor to Hawthorne Melody Inc. As Joe McMahon testified unequivocally in his deposition, he still owns 100% of the stock of Hawthorne Melody Inc. In order for a subsequent company to be a legal successor, there must be a continuity of ownership, an identity of ownership between the prior company and the new company. Not only is there not an identity of ownership, the two Venn diagrams of ownership of these two companies do not even intersect at all. Joe McMahon owns 100% of the prior company. Joe McMahon owns no percent, zero, of Muller Pinehurst Dairy. Again, no one forced Muller Pinehurst Dairy to replete its complaint to call itself a legal successor. Did HM Incorporated own some portion of Prairie Farms? Yes, through the transaction, yes, there was a 50% and then there was that Hall Mel LLC as well. But again, in order for there to be a legal successor under corporate successor liability law, there has to be an identity of ownership. And ultimately, when Muller Pinehurst comes out of this transaction, there is not only not an identity, there is no intersection of the ownership. So, if you look at it from the straight ownership perspective, legal successor has, again, back to your point again, Justice Hutchinson, to defend against this, we submit that there is at least a question of fact. If you dig a little deeper under the surface, we submit that if you look at this transaction, summary judgment really should be and should have been entered on behalf of the defendant. This is not a part of this appeal, correct? We did not appeal from the denial, that is correct. So, could we focus back on the issues before us? Absolutely. Then back to the point, at the very least, there is a significant question of fact. And you don't need a significant one. All you need is one question of fact of a material fact. The identity of the plaintiff could not be a more material fact. So, Mr. McMahon is not an officer or director of Muller Pinehurst, correct? Not at all. He has no ownership whatsoever in the company that is seeking to collect on this account receivable. Even if you put aside the lack of identity of ownership, and back to the other point of were the accounts receivable purchased, they weren't even purchased because they're not stated in the asset purchase agreement. The whole point of an asset purchase agreement is to set forth the assets being purchased, hence the name of the agreement, hence the type of transaction. It would be improper to suggest that you can read in an assumptive, oh, well, why wouldn't they have sold their accounts receivable? That's not what judges are supposed to do, certainly not appellate court, we would submit. The transaction is what it is. If I could just finish my last thought. Apart from the identity of the plaintiff, there were significant questions about the amount, oh, even if we get past the existence or non-existence of a contract. But frankly, this case could easily, apart from all the specific questions about the identity of the plaintiff, the defendant, the amount at issue, whether there was a meeting in 2002, what that meeting involved, apart from all those things, the case of Johannesson v. Edmonds should end this inquiry rather swiftly. Judge Ellsner himself found in the Johannesson case that an oral contract existed on a 2-6-19 motion. In that case, he found that the contract existed to dismiss a case. Here he found that an oral contract existed on a motion to sustain a case and enter judgment for the plaintiff. That's of no consequence. This court could not have been clearer in passing on what Judge Ellsner did on a motion in that case. And this court stated unequivocally that when there is a claim or a defense based on an oral contract,  the existence of an oral contract, its terms and the intent of the parties are questions of fact. The existence of an alleged oral contract requires the presentation of testimony, not mere argument by attorneys. Judge Ellsner being told that once, he didn't have this decision in hand when he ruled in this case. But this court should again reiterate those principles, so mistakes of law of this nature should not be repeated. Thank you very much for your time. I think we'll have a chance to reply. Thank you. Do you wish to argue? May I proceed? Mm-hmm. May it please the court, and good morning. I am Patrick Williams. I am representing the plaintiff in this case. We're losing sight of what this case is all about. This case is about milk purchased by defendant during a 16-week period in 2007. 2007. The period is June 18th to October 5th. That's it. No more, no less. A milk purchase contract. Everyone agrees that defendant purchased milk during this time frame. Everyone agrees that the milk that was purchased was at a rate of about $30,000 of milk product per week. Simple math tells us that 30,000 times 16 weeks is $480,000. The trial court entered some re-judgment in favor of Hawthorne Melody, Muller Pinehurst's successor to Hawthorne Melody, in the amount of $490,078. This case is not about milk that wasn't delivered. It's not about whether plaintiff delivered milk that it shouldn't have, whether the milk that was delivered was defective in some fashion, whether the amount that plaintiff charged was somehow inaccurate, or even whether or not the defendant was properly credited for the amount that the defendant paid. Those are all great potential factual issues that would otherwise deny summary judgment, none of which apply here. Who received the milk? Are we talking about the party? The party. Well, Charles Izzo received the milk. And again, that's one of the great, what I am calling, the dead-end facts that the defendant throws up before the panel. And by dead-end facts, I mean facts that don't go anywhere. They claim that the proper party, the proper defendant in this case, is P&M Distributors, Inc. P&M Distributors, Inc. appears nowhere in any document at any time for that 16-week period that is the subject matter of this cause of action. I mean, we're going back to 1998 with the defendant. We're going back to 2002. That's not where we're looking at. Who paid? I mean, there were some payments according to some of the record during that period of time. Who paid for the milk? That's another great question. Who paid for the milk was something called P&M Dairy Distribution, Inc. That entity doesn't exist. I thought it was P&M Dairy that didn't exist. P&M Dairy, again, correct. You are correct. P&M Dairy doesn't exist either. Nonetheless, Charles Izzo had his business cards, his own invoices that he sent out to his customers were all under P&M Dairy. And that's this whole issue of the disclosed, undisclosed agent that was raised. The point is, the point is that none of those allegations lead anywhere. Okay, counsel, let me just stop you there. Okay. I know you're emphasizing that. As I understand the record, tell me if I'm wrong, the defendant testified that from 1998 to 2007, P&M Distributors, this company, purchased milk and dairy products from Hawthorne Melody. He did testify to that. As I read the record, when Mr. McMahon was asked whether Hawthorne Melody's relationship with the defendant, Mr. Izzo, was personally or with a corporation that the defendant owned, Mr. McMahon replied, I don't know. Right. So follow this logic. You're saying it doesn't lead anywhere. We're giving a short shrift. When one party testifies he did not personally engage in the business, but rather his corporation did, and the other party, Mr. McMahon, testifies that he does not know one way or the other, why is there not an issue of materiality? We're talking about the 2002 meeting, Justice Edson? Well, yeah. Izzo says he wasn't, well, he wasn't there at the 2003 meeting. Well, it's November of 2002. Right. Izzo first says that he wasn't there. He says that he represented, that he always did business under P&M Distributors, Inc. That was in his affidavit. His testimony, though, in his deposition was different from that. He said he never talked to Joe McMahon about P&M Distributors, Inc. That's what's in the record. Again, and that's not how he held himself out as doing business. Well, if you have testimony, it's kind of, he says he did hold himself out that way. McMahon says, I don't know. Why is there not an issue? At best, then, it's an undisclosed or partially disclosed agent. A partially disclosed, excuse me, partially disclosed principal. In the case of either a partially disclosed or an undisclosed principal, the agent is still alive. And that can be decided as a matter of law from those two, from what Justice Hudson just asked you. Well, see, again, this issue, there was testimony in his affidavit. Izzo indicated in his affidavit that he told Joe McMahon that he did business under P&M Distributors, Inc. That was contrary to his deposition testimony because Judge Ellsner struck his affidavit because of the allegation being wholly inconsistent with his deposition testimony. Is that on its face a credibility decision? If you testify, I submit no. If you testify in your deposition and then prepare an affidavit that is directly contrary to your testimony, I don't believe that involves a credibility determination. Why not strike the deposition and go with the affidavit? Because the deposition was the testimony that was relied on in the first instance by the moving party, us. And then when they discovered that the allegation that we were relying on was contrary to what their interest in the case was, they prepared an affidavit that was inconsistent with that, directly contrary. We're not talking about the gray area. We're talking about the black and the white. And again, if there is an issue with respect to P&M Distributors, how does it present itself? Is there ever any evidence in the record to suggest that at some point Charles Izzo said, you know, you keep sending us bills to P&M Dairy. It should be to P&M Distributors Inc., and we're not paying anymore. Or that's the reason why we stopped paying you. That would even be a better instance where the notion of there being some improper party or improper designation, where does that fact lead you? Where does P&M Distributors Inc. lead you? It leads you nowhere in connection with what we have here. Well, doesn't it lead you across the hall from the dairy to the office? I know that affidavit was taken, too, but it was still relied upon. If the argument is that we didn't pay because we were paying the wrong people or we were delivering the milk to the wrong people, good point. Question of fact. It didn't go too long. Question of fact. But it never happened. It never happened. The same notion with Charles Izzo is whether or not he is the proper party, P&M Distributors, P&M Dairy Distribution Inc., all of it, where does it take you? It doesn't take you to an issue of fact with respect to our case. It doesn't take you to an issue of whether or not he was personally liable? The issue of fact, then, is whether or not we – is there any evidence in the record, then? Let's cut it down to its base level. Is there any evidence in the record to suggest that P&M Distributors Inc. is the proper party defendant, that that is the party that the contract was entered into with? I submit no. Never, no way. None of the invoices, none of the checks, none of the representations made by Charles Izzo at any time. In fact, he freely admits he held himself out at P&M Dairy. His customers knew him as P&M Dairy. His business cards were P&M Dairy. His invoices were P&M Dairy. So how do we get to P&M Distributors Inc.? And even if we do, how does that impact their failure to pay for 16 weeks of milk in 2007? It doesn't. There's no connection back to the case, back to our case. Well, that's how you're totally on this issue, you know, because your time is limited. Right. The opposing counsel raises a point that you are required to prove what you plead. You pleaded that you are the legal successor to Hartharm Melody. He's saying that you're not. And the question is, can you point us to anything that delineates or documents a common identity of stack officers and directors? And your point, Justice Hudson, they've got the law completely confused on that point. The Vernon decision, and I asked the court to take a look at the Vernon decision. That is where they are attempting to impose liability on a successor corporation. OK. And that's the instance where you're looking to commonality between shareholders often work. That has nothing to do with the notion that Hartharm Melody, excuse me, Muller Pinehurst is the successor. And I don't know where this legal successor and what the significance of all of that is. They are the successor, or Muller Pinehurst is the successor to Hartharm Melody. And it was set forth in the record that Hartharm Melody in 2002 sold its assets to Prairie Farms. Prairie Farms was a 50 percent member in this Hallmell LLC, and then Muller Pinehurst acquired Hallmell LLC. OK. We've established the link. Again, another dead end fact. Where does that take us with respect to R. Miller? The issue of accounts receivable. OK. Were the accounts receivable sold? OK. Well, again, I'll grant you it's not clear in 2002 what that agreement, what happened in that agreement. But then let's carry forward to 2007. What fact do they allege to suggest we don't know who we're to pay? Or we would pay if we only knew who the proper party was to pay. They were paying until they thought that, number one, they were even, or number two, what the actual amount was. They never denied payment. They said they don't know what they owe. Exactly. Exactly. It's not how long do they owe. They don't know the exact amount. Precisely. Because they had a bad check and then they had, I guess, something that they didn't pay during a period of time. Right. That's the dead end fact, Justice. That's where this goes nowhere. That's where the notion that somehow this accounts receivable thing, that we're paying the wrong party. If they had come back and said, OK, McMahon, we don't know what you did in 2002. But now we've got this other entity out there. Milk producers of America who are making demand upon us to pay them for this milk that was delivered in 2007. Then you've got a good argument. Then there's a factual issue. Do we owe milk distributors of America or do we owe Mueller-Pinehurst, the successor to Hoffer & Mellon? They don't connect the dots. Well, let's jump ahead. OK. Are you entitled to summary judgment when the amount owed is actually disputed? Let's say everything you say is true. That obviously something is due. Correct? No question about it. Maybe it's most of what you want. Something is due. There's issues over whether or not they were properly credited. There's some admission by the bookkeeper of whether something was for cartage. It was actually a bill for milk could be in dispute. Is it also your position that that means nothing, too? No. I'm saying that they have to identify where that number comes in, the cartage issue, for example. Does that apply to the 2007 16-week period? Is it their burden or your burden to prove it? Well, Judge, I submit what the records show. Justice Hudson, the record shows that we've reviewed all of our invoices for the 16-week period. And on top of that, we took the payments they made. Because their record before the trial court was we paid a million and a half dollars. Wow. So we have to be up to date with these people. And they don't submit an affidavit saying that of this $490,000, you failed to credit us cartage fees of $50 or $100. Or there's an invoice that should have been credited. There's no evidence in the record to support the notion that the accounting that was done, and it was done both ways. We said that the invoices are for milk that was actually delivered. And then we said we took the checks that they said were payment for all of the milk that had been provided to them. And we reconciled that. And when we reconcile that, we come up with the amount of the summary judgment, $490,000. That's the amount that's owed. And had there been an affidavit that said, no, there was a cartage fee or there was an amount for milk that was not delivered, then you're absolutely right. But there is no evidence in the record. Those are dead-end facts. Along with the issue of the standing, along with the issue of the successor aspect, in 2007, none of that presented itself. All right. This is a legal document. Your complaint is a legal document. And we, I, I will not speak for my colleagues. I assume that when you use terms, you are using legal terms. What is the legal definition of a successor in interest? The successor is the one that assumes the responsibilities of the predecessor. And so what? Rights and obligations as well. Okay. So what was assumed? Well, again, what we know from the record. Finish your answer. What we know from the record is that, that in 2002, McMahon sold out to Prairie Farms. Okay. We know that in 2002, the assets were sold. We know from the record that as of 2002, Hawthorne Melody Inc. ceased doing business. But it still existed. It still existed. And he was this 100 percent shareholder, which happens in an asset sale agreement, of course. All right. And we know that from 2002 to 2007, that the relationship between Hawthorne Melody and Izzo continued the same way as it had since 1998. So in terms of what the relationship is and what occurred, the entity that went from Hawthorne Melody Inc. to Prairie Farms to Haumel to Muller Pinehurst, and that is tied in in the record. I mean, there is that line or that lineage. That is established. And what had occurred after 2002 all the way until 2007 is they continued to order the milk on a weekly basis. They continued to pay on a weekly basis. They fell behind in 2007. They made some payments. But then they stopped making payments. But to say that there is an issue with respect to who should be receiving, and I'm focusing on what is the tribal issue. Who are we saying that in 2007 the receivable should go to? Who do they identify? Here's a question I have. Why would HM Inc. remain an active corporation with a single shareholder without an asset? It's not an active corporation. It doesn't do business. It's alive. I'm sorry? Why would it maintain its life if it has no asset? It could decide at some point to go into a different business. I mean, quite frankly, Justice, it happens all the time. Assets are sold, and the business continues. All of them? I'm sorry? All the assets sold? All of the assets sold were sold. And what I rely on is the fact that Joe McMahon didn't do business under Hawthorne Melody any longer. And again, though, we have to focus on the tribal issue. What do we try with respect to the milk that was sold and delivered in 2007? Is there someone out there? Is there another entity that's entitled to that receivable other than Mueller Pioneers as successor to Hawthorne Melody? No. Maybe HW or HM Inc. They haven't alleged that. They have not alleged that by way of any competent evidence that there is that entity. And if they did, you got me. I'm done. Summary judgment should not have entered. But you can't look at the dead-end facts to create factual issues when you focus on what the contract is that's the subject matter of our case. And I submit that that summary judgment was proper, that there was a valued effort to throw out facts. But those facts are not material to the issues that were before the trial court, nor are they material to the issues before this court. And I would ask that summary judgment be affirmed. Any other questions? Thank you. Thank you. Counsel, do you wish to reply? No. I'm going to set my own timer so that I don't get surprised by a beep. One second. We won't cut you off in mid-word. Thank you. You were very kind the first time. You did the same with Mr. Williams. Appreciate that. We'll see how that goes. Anyway, what I heard in Mr. Williams' attempts to navigate through your points and questions was that we've got a great trial ahead of us. Because, boy, are there some questions to be resolved at trial. I spent too much of my time... He says our questions are going to dead-ends, though. Yeah. When one puts one's head in the sand and sees nothing but the sand around it, everything's a dead-end. And that's exactly how the brief reads. That's exactly how the record on appeal reads. They take as a given that Charles Izzo was doing business as this PM dairy because he has a business card. Well, what's the point of a business card? I mean, it's to identify yourself to potential clients, potential inter-existing clients. So why do we have a business card that says that? Well, we have a business card because, at some point, business cards also can be responsive rather than proactive. When everyone's calling PM Distributors Inc. a long name, PM Dairy, because they're buying dairy from PM, for ease, you can do that. And, again, we're Muller-Piners, or not even Muller-Piners. They come in way later. Were Hawthorne and Melody a potential client that Charles Izzo said, hey, nice to meet you? Charles Izzo, PM Dairy. That'd be one thing. No. This was a relationship that started in 1998, and there's never been a suggestion in any of the testimony, in any of this record at all, that Hawthorne and Melody didn't know with whom they were dealing back in 1998. Again, if we look at how plaintiff chose to plead this case, and one thing I don't want to forget to point out, the original complaint is a breach of oral contract that supposedly was in 2006. Where's that come in? Three and a half years after the contract on which they obtained summary judgment improperly. Well, the allegation in a pleading, even though withdrawn, still stands as evidence. Plaintiff's own two complaints create a question of fact. Let me ask you this. Counsel makes the argument, has some superficial appeal. Look, we know, they know, everyone knows, we billed them, they owe us some money. Okay? Has a logical appeal to it. Wherein does the amount in dispute, what is the amount that's in dispute, or what causes that amount to be in dispute legitimately, such as to preclude the entry of summary judgment? Why is the amount they say you owe legitimately in dispute? Because, first of all, their records that were purportedly admitted into evidence by Judge Elsner and then relied upon should not have been admitted. There was a plain error there. The two cases that the plaintiff cites about the admissibility of a computer-stored and then printed series of records, he just makes a blanket statement that they're a business record, they're admitted. That's not at all what the case that he cites held. In fact, the case has a lengthy, that we've reproduced in our brief, a lengthy standard. It's not simply, if it's a computer-generated, computer-stored record, you press a button, it's admitted. Quite the contrary. Well, second, we have an entry foundation issue. Again, his argument is money is owed. Is there some issue whether or not you received the proper credit, something was misidentified? What is it in the real world that gives you a leg to stand on that the amount they're seeking is erroneous? They're not accurate. In the real world, there is a significant issue about whether you received the proper credit for the payments made. What is that based on? Pat Izzo's deposition was a bit of a difficult thing to follow. I concede that because I think the question was difficult and the answers were as well. But Mr. Izzo said, why don't we look at all of the money that has been paid and all of the amounts that have been billed, not in a 16-week period. The defendant, whoever the defendant is going to be said to be, Mr. Izzo, we submit no. Significant questions there. P&M Distributors Inc., the name of the company that everybody knew was the company. The trucks, you ask the question to start with, who got the milk? Mr. Williams said Charles Izzo. Charles Izzo did not take pallets of milk on his shoulders. Trucks that were parked outside down the hall, as Justice Hutchinson pointed out, said P&M Distributors, Inc. That's who received the milk. Charles Izzo didn't take one carton. So, again, there's a disingenuity here, disingenuousness in general about So you're disputing the amount? Disputing the amount, certainly, because, overall, there was, again, $2 million paid over a much larger period of time. Good timing. Nice alarm. Can we borrow that for the next case? I got a million on me, as you well know. But, again, if you want to look at the facts through a tunnel or through a certain colored lens, that's exactly what plaintiff is having you do in this case. If you look at 17 weeks, we don't control how they credit payments. We don't control how they bill. They chose a 17-week period. And between who the plaintiff is, who the defendant is, the terms of the contract, whether a meeting even existed, the plaintiff is looking at this case the way it wants to look at this case. There can be no question that this is the way we say it is. The facts, however, as they came out, show questions on every one of these material elements of a contract. We submit it must be reversed. Thank you for your time. Thank you very much, and we are adjourned.